## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

SUSAN S.,

      Plaintiff,

v.                                 CIVIL ACTION NO. 3:24-cv-00088

MICHELLE A. KING, Acting
Commissioner of Social Security,[1]

      Defendant.

### PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Susan S. ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33, and for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f. This matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and is referred to the undersigned United States Magistrate Judge by standing order to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3). Presently pending before this Court are Claimant's *Brief* in support of her claim (ECF No. 7), and the Commissioner's *Brief in Support of Defendant's*

---

[1] The undersigned takes judicial notice that Acting Commissioner Michelle A King resigned from her position on or about February 16, 2025, and subsequently Lee Dudek was appointed as Acting Commissioner of Social Security on or about February 19, 2025, pending Senate confirmation of Frank Bisignano as the next Commissioner. To promote judicial efficiency and clarity, the style of the case has remained the same for purposes of the instant *Proposed Findings and Recommendation*.

*Decision* (ECF No. 8). Having fully considered the record and the arguments of the parties, and for the reasons set forth herein, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Claimant's request for remand (ECF No. 7), **DENY** the Commissioner's request to affirm the final decision (ECF No. 8), **REVERSE** the final decision of the Commissioner; and **REMAND** this matter back to the Commissioner for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).

## I.    BACKGROUND

### A.    Information about Claimant and Procedural History of Claim

Claimant was 55 years old at the time of her alleged disability onset date and 58 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (Tr. 146).[2] She has a high-school diploma and some post-secondary education. (Tr. 78). Her past work history includes positions as a home health aide, stock clerk/cashier, and food worker. (Tr. 97-99). Claimant alleges that she became disabled on May 14, 2020, due to chronic sciatica pain/trouble walking; chronic back pain; degenerative-disc disease and arthritis; chronic headaches; depression and anxiety disorders; fibromyalgia; anterior pelvic tilt; coccydynia (twisted tailbone); and pain in the right hand, arm, and shoulder from a previous injury. (Tr. 113).

Claimant filed her application for benefits on October 30, 2020. (Tr. 110). Her claim was initially denied on or about May 5, 2021, and again upon reconsideration on or about December 27, 2021. (Tr. 162-74, 182-89). Thereafter, on January 20, 2022, Claimant filed a written request for hearing. (Tr. 192-93). An administrative hearing was

---

[2] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 6.

held before an ALJ on April 25, 2023. (Tr. 71-109). On June 22, 2023, the ALJ entered an unfavorable decision. (Tr. 15-36). Claimant then sought review of the ALJ's decision by the Appeals Council on or about November 29, 2023. (Tr. 10). The Appeals Council denied Claimant's request for review on December 29, 2023, and the ALJ's decision became the final decision of the Commissioner on that date. (Tr. 1-7).

Claimant timely brought the present action on February 23, 2024, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed a transcript of the administrative proceedings on April 17, 2024. (ECF No. 6). Claimant subsequently filed her *Brief* in support of her claim on May 16, 2024. (ECF No. 7). In response, the Commissioner filed her *Brief in Support of Defendant's Decision* on June 14, 2024. (ECF No. 8).Claimant then filed her *Reply* brief on June 26, 2024. (ECF No. 9). As such, this matter is fully briefed and ripe for adjudication.

### B. Relevant Evidence

The undersigned has considered all evidence of record pertaining to the parties' arguments, including the relevant medical evidence, and summarizes the relevant portions herein for the convenience of the United States District Judge.

### i. Relevant Treatment Records

Claimant has a number of physical as well as mental-health concerns, a large portion of which stem from a 2014 motor-vehicle collision. As a result of the collision, Claimant sustained problems with her coccyx, or tailbone; right hip; right arm and shoulder; and right leg. (Tr. 77). Additionally, she has problems with sciatica and chronic lower-back pain, with indication of multilevel degenerative-disc disease and osteoarthritis, several bulging discs, and a history of joint fusion. *See id.* Further, Claimant has arthritis in her hands, elbows, right shoulder, hips, knees, ankles, and right

foot. *Id.* She has received treatment for diabetes, and experienced some difficulty with diabetes management. *Id.* There is a history of right-carpal-tunnel-relief surgery as well as a previous torn rotator cuff; further, Claimant has received treatment for migraine headaches, asthma, fibromyalgia, anxiety, depression, and insomnia. *Id.* However, the main focus of Claimant's treatment records on appeal is the extensive medical treatment she received for her musculoskeletal impairments.

Lumbar-spine imaging from February 2021 and March 2021 showed mild degenerative changes. (Tr. 472, 499). On February 18, 2021, Claimant underwent a right-hip injection for pain. (Tr. 478-79). Examination in March 2021 indicated decreased range-of-motion of the right hip. (Tr. 470-71). During an April 1, 2021 examination, Claimant was found to have tenderness to palpation of the bilateral knees, bilateral ankles, right hip, and lumbar spine. (Tr. 591-96). She had painful range-of-motion testing of the cervical spine, lumbar spine, hips, knees, and left ankle; however, she had normal knee and ankle range-of-motion bilaterally, negative bilateral straight-leg-raise tests, and she could stand on one leg, walk on heels, walk on toes, and perform tandem gait without difficulty. *Id.* Claimant performed a "finger Fortin test," which assesses whether a patient is able to consistently localize his or her area of pain using one finger. Claimant's test was positive for the right sacroiliac joint area—the point where the pelvis and lower spine meet. (Tr. 617). Claimant's treatment notes show mild-to-moderate pain on sacroiliac-joint provocative tests. *See id.*

A follow-up examination on April 27, 2021, indicated the following abnormalities: tenderness to palpation of the bilateral knees and right hip; lumbar-paravertebral muscle spasms; positive-straight-leg raising in the sitting position for pain radiating down the right-lower extremity; positive-straight-leg raising in the supine position for pain

4

radiating down the bilateral-lower extremities; diminished strength in the bilateral upper and lower extremities graded at 4/5; "give-away weakness;" and decreased range-of-motion of the cervical spine and dorsolumbar spine. (Tr. 594; 596).

Claimant underwent sacroiliac-joint injections for pain between June 2021 and July 2021. (Tr. 600-01; 605-06). In June 2021, neurosurgeon Sajeel Khan, M.D., noted that Claimant has "pelvic obliquity," or a misalignment of the pelvis, as well as leg-length discrepancy. (Tr. 615). An x-ray image of the lumbar spine dated July 1, 2021, showed prominent degenerative changes of the spine at the facet joints ranging from the "L4" joint to the "S1" joint. (Tr. 674). A follow-up examination in July 2021 showed a positive straight-leg raise on the right, as well as a leg-length discrepancy. (Tr. 612).

In August 2021, Claimant was found to be ambulating independently, she had 5/5 strength without pronator drift, and she had a stable neurological examination. (Tr. 615). However, Dr. Khan identified Claimant's baseline leg-length discrepancy as the source of increased stress of the right sacroiliac joint. (Tr. 610). Dr. Khan diagnosed Claimant with traumatic right-sacroiliac-joint arthritis, and recommended right-sided-sacroiliac-joint-fusion surgery. (Tr. 611). Dr. Khan explained that he believed Claimant would benefit from joint-fusion surgery because she had managed her sacroiliac-joint arthritis conservatively after the motor-vehicle collision, with physical therapy and epidural-steroid injections; however, Dr. Khan noted that the conservative treatment had not been effective long-term, as Claimant "continue[d] to have ongoing pain[.]" *Id.* Pursuant to Dr. Khan's recommendation, Claimant underwent the joint-fusion surgery on November 10, 2021. (Tr. 685-87).

Treatment records, medical imaging, and test results indicate that Claimant continued to experience musculoskeletal problems, including pain, after the surgery. On

November 11, 2021, she was prescribed a front-wheeled walker. (Tr. 917-21). A follow-up examination on December 6, 2021, showed decreased sensation to light touch in the right foot. (Tr. 725). At a follow-up examination with Dr. Khan on December 27, 2021, Claimant reported "experiencing severe right foot pain that radiates up her leg" since the surgery, and reported that she "is still using her walker when she is out of the house." (Tr. 722). On examination, Dr. Khan observed that Claimant's motor strength was "very limited" in the right-lower extremity "due to pain." *Id.* Dr. Khan prescribed a four-point cane and ordered magnetic resonance imaging ("MRI") to be performed. (Tr. 723, 908). In January 2022, two months following surgery, Plaintiff reported that her sacroiliac joint pain had improved significantly. (Tr. 716).

A January 2022 MRI of the spine showed disc bulging at L5-S1 as well as mild degenerative changes. (Tr. 699-700). Further, an electromyogram and nerve conduction study in February 2022 was abnormal, with findings consistent with lower-left lumbosacral plexopathy. (Tr. 704). A subsequent September 2022 follow-up examination with Dr. Khan showed tenderness over the lower-middle back and right buttock, as well as right-knee tenderness on November 2, 2022. (Tr. 854, 868). A November 15, 2022 lumbar x-ray showed degenerative-disc disease, anterior osteophytes at the T12-L1 joints, and neural foraminal narrowing at the L4-5 joint and the L5 through S1 joints. (Tr. 1045).

At a follow-up appointment in May 2022, Claimant reported significant improvement in the pain, numbness, and tingling in her right foot as well as significant improvement in her preoperative symptoms. (Tr. 896). She rated her pain as "a 2 out of 10" and characterized her symptoms as "very manageable." *Id.*

Claimant treated with pain-management specialist Ahmet H. Ozturk, M.D., in late 2022, and with orthopedist Matthew Bullock, D.O., in early 2023. (Tr. 923-924; 1046).

Examination findings indicated facet-column pain in the lower-lumbar spine; mildly tender sacroiliac joints on the right; multiple trigger points; muscle weakness at the S1 dermatome; hypesthesia/hypoalgesia at the S1 dermatome; and positive straight-leg raise on the right. *See id.* Examinations in January and February 2023 confirmed the following abnormalities: antalgic gait; greater-trochanter tenderness; decreased range-of-motion of the right hip and right knee; right-knee effusion; right-knee edema; and right-knee tenderness to palpation. (Tr. 923-24; 933; 936).

In January 2023, x-ray imaging of the right hip/pelvis showed evidence of subchondral sclerosis, along with mild degenerative changes to the bilateral hip joints. (Tr. 926-27). Claimant underwent a right hip injection and a transforaminal epidural steroid injection during this time frame. (Tr. 925-926, 1200-1202). At a physical examination in February 2023, Claimant was noted to have a non-antalgic gait, and she was able to stand and walk unassisted. (Tr. 1106-07).

### ii.    Claimant's Hearing Testimony

At the April 25, 2023 administrative hearing before the ALJ, Claimant was represented by counsel and testified under oath. (*See* Tr. 71-109). Claimant testified that she last engaged in work activity in 2020; at the time, she worked for Nicholas Community Action where her responsibilities included delivering meals to senior citizens at their homes, and providing in-home healthcare. (Tr. 78). These tasks required her to lift and carry items up to forty pounds, and to assist clients weighing up to 300 pounds. (Tr. 79-80). Claimant testified that her employment with Nicholas Community Action ended in May of 2020. (Tr. 80). Between July 2011 and May 2014, Claimant worked with Loved Ones In Home Care as a home-health aide. (Tr. 81). Her job responsibilities included general house care, house cleaning, and assistance with bathing and activities of daily

living. *Id*. Between October of 2002 and April of 2011, Claimant worked for Wal-Mart. *Id*. Her job responsibilities included unloading trucks, stocking shelves, and working as a cashier. (Tr. 81-83). These tasks required her to lift and carry items weighing "no less than 50 pounds." (Tr. 82).

Claimant testified that she sustained injuries in a 2014 motor-vehicle collision when her vehicle was rear-ended by another car. (Tr. 84). The collision caused her to twist her spine, and created a lot of pain in her lower back in addition to muscle strain, a twisted tailbone, and a twisted hip. *Id*. She also underwent fusion of the sacroiliac joint in the hip area in November 2021. (Tr. 86). As a result, she experiences pain radiating down her right leg; the pain is felt on a daily basis. (Tr. 84-85). Claimant also testified about the treatment she received for her back and hip while she was employed with Nicholas Community Action. (Tr. 95). In 2017, she received hip injections about every three months. *Id*. She also went to pain clinic before ultimately undergoing sciatic fusion surgery in November 2021. (Tr. 95-96).

With respect to her ability to move, Claimant testified that the pain interferes with her ability to walk. *See id*. She is unable to "walk far" due to fear of falling; she testified that she "can walk maybe five minutes max." (Tr. 85-86). The pain becomes progressively intense the longer she walks. (Tr. 86). She uses a cane prescribed by her physician, Dr. Kahn, to assist with her mobility; she has used it since January 2022. (Tr. 86). Claimant testified that she cannot stand steadily on both feet; it is painful to stand for any long period of time. (Tr. 87). She can sit for no longer than ten or fifteen minutes at a time due to pain. (Tr. 87-88). Claimant further testified that she has trouble with movements like crouching down because her knees lock up. (Tr. 88). Additionally, she has arthritic pain in her ankles, hips, elbows, and hands. (Tr. 89). Claimant testified that her arthritis causes

her hands to swell on a daily basis, and interferes with her ability to use her hands. *Id*. She has reduced grip strength, has trouble with dropping things, experiences trembling in her hands, and has difficulty with holding a pen and fastening buttons. (Tr. 89-90). After having rotator-cuff surgery, she also experiences a limited range of motion that impairs her ability to fully reach overhead. (Tr. 90).

With respect to other physical impairments, Claimant testified that she also experiences chronic headaches approximately three times per week, which typically last for about four or five hours. (Tr. 90-91). The headaches cause sensitivity to light, noise, and smell, as well as nausea. (Tr. 91). Further, Claimant testified that she is diabetic and has some difficulty with controlling her blood-glucose levels; as a result, she takes prescribed medication and has made changes to her diet. (Tr. 91-92). Claimant testified that, as a result of these physical symptoms, she struggles with completing household chores such as washing dishes; she has to take frequent breaks throughout the day because of her symptoms. (*See* Tr. 87-92).

With respect to her mental-health impairments, Claimant testified that she has had some difficulty with anxiety and depression. (Tr. 92). Specifically, Claimant testified that she experiences anxiety and frustration when it takes her longer to complete daily tasks such as cooking and household chores due to pain; further, her decreased independence as a result of her physical impairments exacerbates her symptoms of depression. (Tr. 92-93). She reported being unable to engage in former activities such as lawn care and working on her vehicle. (Tr. 93). Claimant further testified that she has had problems with her memory and concentration, such as remembering where she put things, as well as trouble with focus and finishing tasks. (Tr. 93-94). Occasionally, she has trouble with keeping appointments and remembering to take her medications. (Tr. 94). Claimant

testified that she is not taking any medication for her depression, and is not treating for depression although she does speak to her pastor at church. (Tr. 96).

The undersigned also notes that, in the "Function Report" Claimant completed in connection with her initial claim for benefits, Claimant reported that she experiences pain in her lower back, hip, and leg. (Tr. 337). Claimant reported that she cannot stand or walk for long periods of time. *Id.* Further, her limitations affect her ability to lift, squat, bend, stand, reach, walk, sit, and kneel. (Tr. 342). Claimant also reported that she can walk for about fifty feet before needing to stop and rest. *See id.*

### iii.    Vocational Expert Testimony

At the April 25, 2023 administrative hearing, the ALJ employed a vocational expert ("VE") to aid in determining whether Claimant could perform her past relevant work or other work. (Tr. 97). The ALJ asked the VE to classify Claimant's past relevant work. *Id.* The VE testified that Claimant's work at Nicholas Community Action was a composite position between a food deliverer, food assembler, and home-health aide. (Tr. 97-98). The VE classified the food-deliverer position at the medium exertional level, as performed, with a specific vocational preparation ("SVP") of two. (Tr. 97). The VE classified the food-assembler position at the light exertional level generally, but at the medium exertional level "as performed," with an SVP of three. (Tr. 97). The VE characterized Claimant's position at Loved Ones in Home Care as a home-health aide, classified at the medium exertional level generally, but at the very heavy exertional level as actually performed, with an SVP of three. (Tr. 97-98). Lastly, the VE testified that Claimant's work at Walmart was a composite position as a stock clerk and cashier/checker. (Tr. 98). The VE classified the stock-clerk position at the heavy exertional level, as performed, with an SVP of four.

*Id.* The VE classified the cashier position at the light exertional level generally, but at the heavy exertional level as performed, with an SVP of three. *Id.*

The ALJ next asked the VE a series of hypothetical questions. *Id.* For the first hypothetical, she asked the VE to assume that a hypothetical individual had the same age, education, and past work experience as the Claimant, and could perform medium work with occasional climbing and crawling; frequent balancing, stooping, kneeling, and crouching; and the ability to tolerate frequent exposure to extreme cold, extreme heat, wetness, vibration, fumes, odors, dust, gases, and poor ventilation. (Tr. 98-99). The ALJ then asked whether the hypothetical individual would be able to perform the Claimant's past work. (Tr. 99). In response, the VE testified that the stock-clerk position and the composite stock-clerk/cashier position would be precluded. *Id.* Further, the home-health-aide position "would remain as generally [performed] but not as actually [performed] in both settings." *Id.* Finally, the VE testified that the composite food-deliverer/food-assembler position "would remain both [as] generally and actually [performed]." *Id.* The VE also testified that other jobs would be available to the hypothetical individual, with the representative examples of linen-room attendant, dishwasher, and hand packager. *Id.*

Next, the ALJ asked the VE to assume that the same hypothetical individual had additional limitations, namely, she could "occasionally reach overhead with the bilateral upper extremities" and "frequently handle and finger" with her extremities. (Tr. 99). In response, the VE testified that the latter limitation would not preclude any of the aforementioned positions. (Tr. 100). The VE testified that the overhead-reaching limitation would preclude the home-health-aide position, both as generally and actually performed, as well as the cashier and composite stock-clerk/cashier positions, the food-

assembler position, the composite food-assembler/food-deliverer position, the hand-packager position, linen-room attendant position, and dishwasher position. *Id.* However, the VE testified that other medium jobs would still be available when considering these additional limitations, including the representative positions of retail sales clerk, patient transporter, and laundry laborer. (Tr. 100-101).

For the next hypothetical, the ALJ changed the exertional level and postural limitations, such that the hypothetical individual could perform light work, limited to occasionally climbing, balancing, stooping, kneeling, crouching, and crawling. (Tr. 101). The environmental limitations would remain the same, such that the individual could tolerate frequent exposure to extreme cold, extreme heat, wetness, vibration, fumes, odors, dust, gases, and poor ventilation. *Id.* In response, the VE testified that the Claimant's past work would be precluded for the hypothetical individual, with "no transferable skills[.]" *Id.* However, the VE testified that the skills from the cashier/checker position would be transferable. (Tr. 101-102).

Next, the ALJ asked the VE to assume that the hypothetical individual "was limited to [a] sedentary" level of exertion, but "everything else would remain the same from this hypothetical[.]" (Tr. 102). In response, the VE testified that there would be no transferable skills from Claimant's past work. (Tr. 102-103). Further, the VE testified that if the individual would need to use a cane for ambulation, the individual would not be able to perform Claimant's past relevant work; nor would the individual be able to perform the cashier/checker position. (Tr. 103). The VE also testified that all work would be precluded if the individual would miss two days per month on a consistent basis. *Id.*

In response to questions from Claimant's counsel, the VE then testified that all work would be precluded if a hypothetical individual was limited to sitting, standing, or

walking for no more than 30 minutes at one time before they would need a five-to-ten-minute break. (Tr. 104). Additionally, the VE testified that the hand-packager and retail-clerk positions "would be impacted" if a hypothetical individual was limited to jobs that do not require any fast-paced teamwork. (Tr. 104-105). Likewise, the dishwasher position would be eliminated if a hypothetical individual was limited to bending, stooping, and crouching only occasionally. (Tr. 105). Further, the VE testified that the representative positions she provided would all be eliminated if the hypothetical individual would need "a sit/stand option to perform the work," because those positions "would have to be standing." (Tr. 106). The VE further testified that all of the Claimant's past work, as well as the representative positions the VE provided, would be precluded if the hypothetical individual was limited to "occasionally handling, fingering, and feeling with the right dominant hand[.]" *Id.* All work would also be precluded if the hypothetical individual would need "frequent reminders regarding their job duties throughout the day," or if the individual would be unable "to maintain concentration for task completion more than 30 minutes at one time[.]" *Id.* Finally, the VE testified that employers' tolerance for off-task time would be no more than five percent off task, such that the individual may be off task for "no more than an additional twenty-four minutes within an eight-hour work day outside of . . . standard scheduled breaks[.]" (Tr. 107).

### iv.    Prior Administrative Findings

On May 24, 2021, Rabah Boukhemis, M.D., the state-agency reviewer determined at the initial level of consideration that Claimant can perform work at the medium level of exertion, in that she can lift/carry fifty pounds occasionally and twenty-five pounds frequently; stand/walk for six hours in an eight-hour workday and sit for 6 hours in an eight-hour workday. (Tr. 122-125). Further, Dr. Boukhemis

determined that Claimant had the following postural limitations: she can occasionally climb ramps, stairs, ladders, ropes, and scaffolds; occasionally crawl; frequently balance, stoop, kneel, and crouch. (Tr. 123-124). With respect to environmental limitations, Dr. Boukhemis assessed the following limitations: Claimant must avoid concentrated exposure to vibration, extreme cold, and hazards. (Tr. 124).

On December 27, 2022, state-agency reviewer Uma Reddy, M.D., made similar findings on reconsideration, with some exceptions. In contrast to Dr. Boukhemis, who opined that Claimant could perform medium work, Dr. Reddy opined that Claimant could perform light work. (Tr. 150-159). Further, while Dr. Boukhemis opined that Claimant could lift/carry fifty pounds occasionally and twenty-five pounds frequently, Dr. Reddy opined that Claimant could only lift/carry twenty pounds occasionally, and ten pounds frequently; likewise, Dr. Reddy determined that Claimant can only occasionally—rather than frequently—balance, stoop, kneel, and crouch. *See id*. Lastly, with respect to environmental limitations, Dr. Reddy assessed that Claimant must also avoid concentrated exposure to extreme heat and wetness, and avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. 150-151). Despite these additional restrictions, Dr. Reddy determined that Claimant could perform her past relevant work as a home-health aide. (Tr. 150-52). Notably, it is undisputed that Dr. Reddy's review on reconsideration was conducted following review of "additional evidence not previously available" to Dr. Boukhemis on initial review. (*See* ECF No. 8 at 7).

### C.    Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step. At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an

impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special

technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id*. §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her

"not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements of the Social Security Act through September 30, 2022. (Tr. 20). She further determined that Claimant had not engaged in substantial gainful activity since May 14, 2020, the alleged onset of her disability. *Id.* She found that Claimant's osteoarthritis of the bilateral hips and right knee; iliotibial band syndrome; sacroiliac joint dysfunction/sacral arthritis; lumbar-degenerative-disc disease with radiculopathy; and mild scoliosis, all constituted "severe" impairments. (Tr. 21). However, the ALJ found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 23).

Upon assessing Claimant's RFC, the ALJ determined that Claimant is able "to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c)," except that Claimant "can occasionally climb and crawl and frequently balance, stoop, kneel and crouch." (Tr. 24). Additionally, the ALJ determined that Claimant "can tolerate frequent exposure to extreme cold, extreme heat, wetness, vibration, fumes, odors, dusts, gases, and poor ventilation. *Id.*  As Claimant notes in her opening brief, "medium work" is defined in the regulations as work requiring mostly standing/walking, occasional lifting of 50 pounds, and frequent lifting of 25 pounds. (ECF No. 7 at 2 n.3 (citing 20 C.F.R. § 404.1567(c))).

The ALJ concluded that, given the limitations imposed by the Claimant's RFC, she was unable to perform her past relevant work. (Tr. 28). She noted that Claimant is "an individual of advanced age" with "at least a high school education" and that

"[t]ransferability of job skills [was] not material to the determination of disability." *Id*. Because the ALJ determined that Claimant was unable to perform the full range of medium work, she enlisted a VE to aid in her finding that Claimant is capable of performing other jobs that exist in significant numbers in the national economy, including the representative positions of linen room attendant, dish washer, and hand packager. (Tr. 29). As a result, the ALJ concluded that Claimant "has not been under a disability, as defined in the Social Security Act, from May 14, 2020, through the date of [the ALJ's] decision." *Id*.

## II.    LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id*. (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id*. (quoting *Craig*, 76 F.3d at 589).

## III.   DISCUSSION

Claimant's central argument before this Court is that the ALJ's decision was entered in error. According to the Claimant, the ALJ's finding that Claimant can perform work at the medium level of exertion—and thereby that Claimant can lift 50 pounds and stand/walk for most of the day—is not supported by substantial evidence because (1) it conflicts with the record evidence. (ECF Nos. 7; 9 at 5-6). According to the Claimant, the ALJ's RFC determination is not based on a reasonable interpretation of the record in light of Dr. Reddy's opinion, as well as Claimant's self-described limitations which show greater lifting and standing/walking limitations than the ALJ found. (ECF No. 7 at 4).

In response, the Commissioner argues that the decision should be affirmed because the ALJ properly considered the record evidence and Claimant's subjective complaints, and her RFC finding is supported by substantial evidence. (ECF No. 8 at 9). In support, the Commissioner asserts that the ALJ reasonably determined that Claimant's treatment records showed a history of improvement, with medical records demonstrating "mostly mild findings." *Id.* at 1. The Commissioner further asserts that the ALJ properly considered Claimant's subjective complaints because Claimant's own account was inconsistent with the objective medical evidence of record. *Id.* at 1-2. The Commissioner argues that the RFC finding is supported by substantial evidence, and thus should be affirmed. *Id.* at 9.

In her reply brief, Claimant reiterates that—in accordance with the Fourth Circuit's 2020 opinion in *Arakas v. Soc. Sec. Admin.*, 983 F.3d 83 (4th Cir. 2020)—the ALJ applied an incorrect legal standard in discrediting her subjective complaints based on a lack of objective evidence corroborating them. (ECF No. 9 at 2). Furthermore, Claimant argues that the ALJ did not merely commit harmless error, because the difference between an

ability to perform medium jobs and light jobs "is outcome determinative in this case . . . based on application of [the Agency's] grid rules [under] 20 C.F.R. § 404, Subpt. P, App. 2, § 202.06." *Id.* at 2-3.

Based upon the undersigned's review, it appears that Claimant takes particular issue with the ALJ's following findings:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. Overall, the claimant's symptoms are not supported by the record given her good improvement after surgery . . . . The claimant's reported of musculoskeletal pain and dysfunction are well accorded a limitation to medium work with limitations on postural maneuvering and other environmental triggers.

(Tr. 25). The basis for the ALJ's decision is her determination that Dr. Boukhemis's state-agency findings—in which Dr. Boukhemis opined that Claimant could perform medium work—were persuasive, while the ALJ was unpersuaded by Dr. Reddy's more favorable findings on reconsideration, in which Dr. Reddy opined that Claimant could only perform light work. (*See* Tr. 27).

As Claimant highlights in her brief, the ALJ's explanation for crediting Dr. Boukhemis's opinion over Dr. Reddy's is problematic—particularly as it is undisputed that Dr. Reddy's findings "were based on new evidence that was not available at the time of the initial State Agency review" by Dr. Boukhemis. (ECF No. 7 at 11; *see also* ECF No. 8 at 7 (acknowledging that Dr. Reddy's review on reconsideration was conducted following review of "additional evidence not previously available" to Dr. Boukhemis on initial review)). The ALJ acknowledged in her written decision that Dr. Reddy had the benefit of the new information on reconsideration that was not available to Dr.

Boukhemis on initial review. However, Claimant takes issue with the ALJ's mere conclusory dismissal that these new records "show[ed] mostly stable functioning and do not support a limitation to light work." *Id.* (citing Tr. 27). The ALJ then asserted that Dr. Reddy's assessment is inconsistent with (1) good improvement with pain medication, injections, PT, and surgery; (2) imaging and EMG showing mostly mild findings; and (3) physical examinations which showed mostly normal gait, strength, and range of motion. *See id.* However, as Claimant demonstrates, the ALJ's findings are not fully supported by the record—and the ALJ failed to reconcile the conflicting evidence in her written decision, largely overstepping the issue completely.

The new evidence specifically considered by Dr. Reddy—and not considered by Dr. Boukhemis's earlier opinion—includes records from 2021 in which Claimant was treated by Dr. Khan at Marshall Neurosurgery and assessed with right-sacroiliac-joint arthritis. (Tr. 148; 156). Claimant underwent sacroiliac-joint injections on June 14, 2021, and July 28, 2021, followed by right-sided sacroiliac-joint-fusion surgery at the recommendation of her neurosurgeon, Dr. Khan. (Tr. 611). Dr. Khan's records consistently document objective testing that is positive for pain. The undersigned therefore agrees with Claimant that—without more to illustrate the ALJ's reasoning—the ALJ's conclusory assertion that the new records showed "mostly stable functioning" is unreasonable and not supported by substantial evidence.

Further, the ALJ's conclusory assertion that Claimant's musculoskeletal symptoms improved with treatment once again sidesteps, without resolving, conflicting evidence. Dr. Kahn expressly found that Claimant was an appropriate candidate for the sacroiliac-joint fusion surgery because she continued to have pain despite her previous conservative treatment with physical therapy and injections. (Tr. 611). Furthermore, Claimant's

treatment records indicate that, after her fusion surgery, Claimant was found on examination to demonstrate tenderness over the middle of the low back and right buttock; facet column pain in the lower lumbar spine; mildly tender sacroiliac joints on the right; multiple trigger points; muscle weakness at the S1 dermatome; hypesthesia/hypoalgesia at the S1 dermatome; and positive straight leg raise on the right; antalgic gait; greater trochanter tenderness; decreased range of motion of the right hip and right knee; right knee effusion; right knee edema; and right knee tenderness to palpation. (Tr. 854, 868, 923-924, 933, 936, 1046). Moreover, after undergoing fusion surgery, Claimant continued to receive injections. (Tr. 925-26, 1200-1202). Thus, without an adequate discussion of this conflicting evidence, the ALJ's conclusory determination that Dr. Reddy's findings are unpersuasive because Claimant improved with treatment is not supported by substantial evidence.

Next, Claimant turns to the ALJ's assertion that medical-imaging and testing showing mostly mild findings, and once again argues that the ALJ "cherry-picked" normal findings while sidestepping medical imaging results that conflicted with her conclusion. Certainly, it is undisputed that imaging of Claimant's lumbar spine initially showed only mild degenerative changes, (*See* Tr. 472; 499; 699-700; ECF No. 7 at 13); however, the ALJ failed to acknowledge that Plaintiff's most recent lumbar imaging was positive for degenerative-disc disease; anterior osteophytes at the T12 through L1 joints; and neural foraminal narrowing at the L4 and L5 joints as well as the L5 and S1 joints. (Tr. 1045). Nor did the ALJ acknowledge the July 1, 2021 x-ray imaging showing prominent degenerative changes at the facet joints from the L4 through S1 joints. (Tr. 674).

The ALJ also found that Dr. Reddy's limitation to light work is inconsistent with her electromyogram ("EMG") results, on the conclusory grounds that Claimant's EMG

"showed mostly mild findings." (Tr. 27). However, the EMG/nerve conduction study shows that the results were abnormal, with findings consistent with lower-left lumbosacral plexopathy. (Tr. 704). The ALJ completely failed to reconcile this evidence, leaving it unclear how she reached her determination that the abnormal EMG findings are "mostly mild" or how the testing data is inconsistent with Dr. Reddy's assessment that Claimant is limited to light work.

Lastly, Claimant challenges the ALJ's conclusion that physical examinations showed "mostly normal" gait, strength, and range of motion. (Tr. 27). Simply put, the ALJ's conclusory assertion conflicts with examination findings confirming an antalgic gait and use of assisted devices for ambulation; decreased strength, and decreased range of motion of the right hip, right knee, cervical and dorsolumbar spine. (*See* Tr. 470-71; 594; 596; 612; 617; 722; 725; 854; 868; 923-24; 933; 936; 1046). The ALJ committed error, because her written decision merely sidesteps this evidence without explaining the ALJ's rationale for resolving these conflicts.

The ALJ's focus on "cherry-picked" evidence, amid her failure to address this conflicting evidence in her written decision, prevents meaningful judicial review; as the Fourth Circuit explained in its 2020 *Arakas* opinion, this lack of discussion deprives the courts of the requisite "accurate and logical bridge" between the evidence and the ALJ's decision that is necessary to determine whether the ALJ's decision is supported by substantial evidence. *See Arakas v. Soc. Sec. Admin.*, 983 F.3d 83 (4th Cir. 2020). The Fourth Circuit found in *Arakas* that the ALJ's decision required remand because he "cherry-picked" from the record and failed to acknowledge that there *was* objective evidence to support the claimant's subjective complaints—in the form of a treating physician's opinion documenting evidence of trigger points, one of "the only 'objective'

sighs of fibromyalgia." *Id.* at 97. The Fourth Circuit ultimately determined in *Arakas* that the ALJ's decision was not supported by substantial evidence, because, *inter alia*, the ALJ erred by making "several misstatements of material facts and selectively cit[ing] from the evidence of record." *Id.* at 97-98. That is precisely what has occurred in the case at hand. In light of the ALJ's conclusory discussion in this case, in which she sidestepped and mischaracterized conflicting evidence, the Court is unable to confirm whether her decision is supported by substantial evidence. Simply put, the undersigned **FINDS** that the record does not demonstrate that the ALJ performed an adequate review of the whole record and that the decision to deny benefits is supported by substantial evidence. The ALJ's conclusions may very well have been correct—it is not the Court's role to second-guess the ALJ in resolving conflicting evidence; however, the ALJ is obligated to explain *how* she resolved that conflicting evidence—something she did not do here. Consequently, remand is required on this basis.

In the response brief, the Commissioner highlights that the ALJ's RFC finding was supported by the ALJ's conclusion that Claimant's "activities of daily living . . . were consistent with a limitation to medium work." (ECF No. 8 at 11). Specifically, the ALJ noted that Claimant "spent her days taking care of her grandchildren" and "occasionally attended church." *Id.* (citing Tr. 26, 506, 604). The Commissioner also points to treatment notes showing (1) Claimant was "capable of participating in [her] own activities of daily living" following her joint-fusion surgery, and (2) Claimant was noted to have ridden a bicycle a few months following her surgery. *Id.* (citing Tr. 25, 874).

The undersigned agrees with Claimant that the ALJ's brief, conclusory, and somewhat inaccurate analysis of Claimant's daily activities falls directly afoul of the

Fourth Circuit's clear instructions in *Arakas*. Specifically, in her written decision, the ALJ found as follows, *in full*:

> The claimant's activities of daily living are consistent with a limitation to medium work. The claimant spends her day taking care of her grandchildren (Exhibit 6F/4). She likes to go to church (Exhibit 6F/4). One day after back surgery, the claimant's neurosurgeon stated the claimant "is capable of participating in their own activities of daily living" (Exhibit 14F/17).

(Tr. 26).

The Fourth Circuit expressly criticized such a selective and highly conclusory summary of daily activities as error in *Arakas*, at length.[3] In that case, the ALJ found that the extent to which claimant's disabling symptoms and limitations affected her ability to work was inconsistent with her daily activities, which included such tasks as "using a computer, performing household chores, driving, shopping, walking for exercise, cooking, making her bed, doing laundry, doing yard work, and painting." *Id.* at 100. The Fourth Circuit explained that the ALJ's conclusion in *Arakas* was not supported by substantial evidence, because he "provided no explanation as to how those particular activities . . . showed that [the claimant] could persist through an eight-hour workday." *Id.* The Fourth Circuit then "bemoaned the tendency of ALJs to overstate claimants' Residual Functional Capacities and ability to work based on their daily activities," and explained that there are "critical differences between activities of daily living and activities in a full-time job[.]" *Id.* at 101. Namely, "a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as she would be by an employer." *Id.* The Fourth Circuit thus

---

[3] The Commissioner emphasizes in the response brief that the Fourth Circuit's *Arakas* opinion "focused extensively on the standard for evaluating fibromyalgia," which was not an issue in this case. (ECF No. 8 at 16-17). However, the Fourth Circuit has been clear that the principles and logic set forth in *Arakas* are not limited to cases involving fibromyalgia. *See Oakes v. Kijakazi*, 70 F.4th 207, 217 (4th Cir. 2023).

concluded in *Arakas* that "substantial evidence does not support the ALJ's conclusion that Arakas's activities were inconsistent with her subjective complaints but consistent with his Residual Functional Capacity assessment." *Id.*

Here, just as in *Arakas*, Claimant's church attendance, and supervision of her grandchildren—particularly, in a vacuum as presented with no further analysis from the ALJ—does not constitute substantial evidence of Claimant's ability to sustain full-time work at the medium level of exertion. The ALJ's written decision provides no description of what type of physical activities these tasks entail for the Claimant; nor does the ALJ provide *any* insight whatsoever to illustrate how these activities are purported to translate to Claimant's "ability to do sustained work-related activities on a regular and continuing basis—*i.e.*, 8 hours a day, for 5 days a week, or an equivalent work schedule." *Arakas*, 983 F.3d at 90 (citing SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996)).

Likewise, the treatment note stating generally that Claimant was capable of performing her activities of daily living does not advance the ball meaningfully. As to the ALJ's emphasis that Claimant was noted to have ridden a bicycle on *one occasion* following surgery, the undersigned notes that, in fact, the November 18, 2022 neurosurgery clinic note which references bicycle riding states that Claimant's right-leg pain improved significantly until Claimant "then had a *bicycle accident* and *subsequently the right leg pain started again and has now gotten significantly worse*." (Tr. 874). Not only does a single incident of bicycle riding tell us almost *nothing* about Claimant's ability to engage in sustained work-related activities on a regular and continuing basis at the medium level of exertion, but in fact the note from which the ALJ pulled this information directly contradicts a finding that Claimant's symptoms were improving. Worse, the ALJ provided zero explanation to resolve this conflict. As such, she fell short of her

responsibility of providing an accurate and logical bridge between the evidence and her conclusion—leaving the Court no basis for determining whether her conclusions are supported by substantial evidence.

The Commissioner also points out in the response brief that "therapy notes highlight multiple instances of either no pain or instances of pain unrelated to her impairments," as well as multiple treatment notes which support a finding that Claimant's symptoms were improving over time. (ECF No. 8 at 13). The Commissioner also emphasizes "that an individual is not required to be pain-free or experiencing no discomfort in order to be able to work." *Id.* (quoting *Hays v. Sullivan*, 907 F.2d 1453, 1458 (4th Cir. 1990)). Certainly, it is the ALJ's role, and not the Court's, to resolve conflicts in the evidence. Rather, in reviewing the ALJ's "unenviable task of choosing between the alternatives," presented by conflicting evidence, the Court's task is to ensure that the ALJ has carefully considered the evidence, made reasonable and supportable inferences, and explained her conclusions without ignoring conflicting evidence. *Henson o/b/o M.D.R.H. v. Kijakazi*, 3:20-cv-00673, 2022 WL 873681, at *7 (S.D. W. Va. Mar. 7, 2022), *adopted*, 2022 WL 866270 (S. D. W. Va. Mar. 22, 2022) (citing *McCall v. Apfel*, 47 F. Supp. 2d 723, 731 (S.D. W. Va. 1999). Here, the ALJ considerably sidestepped, and at times even mischaracterized, conflicting evidence in this case. Accordingly, pursuant to the clear language of *Arakas*, 983 F.3d at 90, the undersigned **FINDS** that substantial evidence does not support the ALJ's conclusion that Claimant's activities were consistent with her RFC assessment—and remand is required.

## IV.    RECOMMENDATION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Claimant's request for remand (ECF No. 7), **DENY** the

Acting Commissioner's request to affirm the final decision (ECF No. 8), **REVERSE** the final decision of the Acting Commissioner; and **REMAND** this matter back to the Acting Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Chambers.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTERED:   February 24, 2025

Dwane L. Tinsley
United States Magistrate Judge

29